# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MANTI HOLDINGS, LLC, MALONE ) 
MITCHELL, WINN INTERESTS, LTD., )
EQUINOX I. A TX, GREG PIPKIN, )
CRAIG JOHNSTONE, TRI-C )
AUTHENTIX, LTD., DAVID MOXAM, )
JOHN LAL PEARCE, and JIM )
RITTENBURG, )
                                     )
          Plaintiffs, )
                                     )
     v. )  C.A. No. 2020-0657-SG
                                     )
THE CARLYLE GROUP INC., )
CARLYLE U.S. GROWTH FUND III, )
L.P., CARLYLE U.S. GROWTH FUND )
III AUTHENTIX HOLDINGS, L.P., )
CARLYLE INVESTMENT )
MANAGEMENT L.L.C., TCG )
VENTURES III, L.P., BERNARD C. )
BAILEY, STEPHEN W. BAILEY, and )
MICHAEL G. GOZYCKI, )
                                     )
          Defendants. )

## MEMORANDUM OPINION

Date Submitted:  February 18, 2022
Date Decided:  June 3, 2022

Rolin P. Bissell, Paul J. Loughman, and Alberto E. Chávez, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; OF COUNSEL:  D. Patrick Long, Jonathan R. Mureen, and John Tancabel, of SQUIRE PATTON BOGGS (US) LLP, Dallas, Texas, *Attorneys for Plaintiffs*.

Albert H. Manwaring IV and Kirsten Zeberkiewicz, of MORRIS JAMES LLP, Wilmington, Delaware; OF COUNSEL: Robert A. Van Kirk, Sarah F. Kirkpatrick, and Lauren Uhlig, of WILLIAMS & CONNOLLY LLP, Washington, DC, *Attorneys for Defendants*.

**GLASSCOCK, Vice Chancellor**

This is the latest scene in a long stage-play involving the sale of a Delaware corporation, Authentix Acquisition Company, Inc. ("Authentix"). As with a Broadway musical, the orchestra has played me many a tune, but a single melodic line tends to run throughout. Here, it was a stockholders agreement, entered by all stockholders to encourage investment by an entity that became a controller thereby; a subsidiary of The Carlyle Group, Inc.

The stockholders agreement required all stockholders to not oppose any sale of Authentix approved by the company board and by a majority of the outstanding shares—that is, by Carlyle. In 2017, Carlyle and the board approved a sale of Authentix to Blue Water Energy. The terms of the sale together with the stockholders agreement meant that holders of preferred equity—notably, Carlyle—would recoup their investment, but that common stockholders—including the Plaintiffs here—would receive little or nothing for their stock. Much litigation has ensued.[1]

Briefly, this action alleges that Carlyle and the directors breached fiduciary duties to the stockholders of Authentix in approving the sale to Blue Water Energy. I have found that the terms of the stockholders agreement did not preclude the Plaintiffs from bringing this action.[2] Remaining before me is the Defendants'

---

[1] *E.g.*, *Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199 (Del. 2021).
[2] *See generally Manti Holdings, LLC v. Carlyle Grp. Inc.*, 2022 WL 444272 (Del. Ch. Feb. 14, 2022).

motion to dismiss under Rule 12(b)(6). While I agree with the Defendants that certain ancillary claims must be dismissed, I find that the gravamen of the Plaintiffs' complaint—its allegations that the Defendants breached fiduciary duties regarding the sale—does state claims upon which relief can be granted. My reasoning is below.

## I. BACKGROUND[3]

### A. Parties and Relevant Non-Parties

Non-party Authentix is a Delaware corporation.[4] On September 12, 2017, the Authentix board of directors (the "Board") voted 4–1 to sell Authentix to Blue Water Energy for a combination of guaranteed and contingent cash consideration (the "Sale").[5] At the time of the Sale, Authentix's capital structure featured common stock and three series of preferred stock.[6] The preferred stockholders were entitled to be paid the first $70 million of any sale consideration, and the common stockholders were only entitled to receive distributions above the first $70 million.[7]

---

[3] Unless otherwise noted, the facts referenced in this Memorandum Opinion are drawn from the Verified Amended Complaint, Dkt. No. 38 [hereinafter "Am. Compl."] and the documents incorporated therein. Citations in the form of "Lintner Aff." refer to the Affidavit of Matthew F. Lintner in Support of Defendants' Opening Brief in Support of Motion to Dismiss the Verified Amended Complaint, Dkt. No. 39. Citations in the form of "Lintner Aff. Ex. –" refer to exhibits attached to the Lintner Aff.

[4] Am. Compl. ¶ 14.

[5] Id. ¶¶ 1, 100–03.

[6] Id. ¶ 40.

[7] Id. ¶¶ 40–41.

The Plaintiffs are individual and entity stockholders of Authentix, each of whom held Authenix stock at the time of the Sale.[8] One of the Plaintiffs, Manti Holdings, LLC ("Manti"), had a representative on the Authentix Board, Lee Barberito.[9]

Defendant Carlyle U.S. Growth Fund III Authentix Holdings, L.P. ("Carlyle Holdings") is a Delaware limited partnership with its principal place of business in Washington, D.C.[10] Carlyle Holdings was the record holder of a majority of Authentix's common and preferred stock at the time of the Sale.[11]

Defendant Carlyle U.S. Growth Fund III, L.P. ("Carlyle Growth") is a Delaware limited partnership with its principal place of business in Washington, D.C.[12] Carlyle Growth is the direct parent of Carlyle Holdings.[13]

Defendant TCG Ventures III, L.P. ("TCG") is a Delaware limited partnership with its principal place of business in Washington, D.C.[14] TCG is the general partner of and manages Carlyle Growth.[15] TCG also had a "management agreement" with Authentix.[16]

---

[8] *Id.* ¶¶ 15–25.
[9] *Id.* ¶¶ 2, 37, 44.
[10] *Id.* ¶ 28.
[11] *See id.* ¶¶ 28, 39.
[12] *Id.* ¶ 27.
[13] *Id.*
[14] *Id.* ¶ 30.
[15] *Id.*
[16] *Id.*

Defendant Carlyle Investment Management, LLC ("Carlyle Investment") is a Delaware limited liability company with its principal place of business in Washington, D.C.[17]  Carlyle Investment is the "primary SEC registered investment advisor" for Carlyle Growth, TCG, and "related entities."[18]

Defendant The Carlyle Group, Inc. ("Carlyle Group") is a publicly traded Delaware limited partnership, with its principal place of business in Washington, D.C.[19]  Carlyle Group is the "ultimate parent" of Carlyle Holdings, Carlyle Growth, TCG, and Carlyle Investment.[20]

Defendant Steve Bailey was an Authentix director at the time of the Sale.[21] He is also a managing director of Carlyle Group and Carlyle Growth, and an officer of TCG.[22]  In addition, Bailey is an officer of Carlyle U.S. Growth Fund III Authentix Holdings GP, L.L.C., which has "full authority" to act on behalf of and Carlyle Holdings.[23]

---

[17] *Id.* ¶ 29.
[18] *Id.*
[19] *Id.* ¶ 26.
[20] *Id.*
[21] *Id.* ¶¶ 32, 103.
[22] *Id.* ¶ 32.
[23] *Id.*

Defendant Michael Gozycki was an Authentix director at the time of the Sale,[24] and a managing director of Carlyle Group.[25] Gozycki is also an officer of TCG, and he is vested with "full authority" to act on behalf of Carlyle Growth.[26]

Defendant Bernard Bailey was a director and the CEO of Authentix at the time of the Sale.[27]

Non-party J.H. Whitney & Company ("Whitney") was the second largest Authentix preferred and common stockholder.[28] Whitney nominated one Authentix director, non-party Paul Vigano, who served on the Board at the time of the Sale.[29]

I refer to Defendants Carlyle Holdings, Carlyle Growth, TCG, Carlyle Investments, and Carlyle Group collectively as "Carlyle." I refer to Gozycki, Steve Bailey, and Bernard Bailey collectively as the "Director Defendants."

*B. Factual Background*

In October 2015, Authenix began exploring a potential sale.[30] For the duration of the sale process, the Authentix Board was composed of Defendant Bernard Bailey; Defendants Steve Bailey and Gozycki, as representatives of Carlyle;

---

[24] *Id.* ¶¶ 33, 103.
[25] *Id.* ¶ 33.
[26] *Id.*
[27] *Id.* ¶¶ 31, 43, 103.
[28] *Id.* ¶ 2.
[29] *See id.* ¶¶ 2, 42, 44, 102–03.
[30] *See id.* ¶ 47.

5

Barberito, as a representative of Manti; and Vignano, as a representative of Whitney.[31]

At the outset, five investment banks met with Authentix to pitch their services in connection with a potential sale.[32] After reviewing Authentix's financials, each of the banks represented that they believed they could achieve a sale at or above $200 million.[33] Authentix selected Baird, which had stated that it believed it could achieve a sale "in excess of $200 million," to serve as its banker.[34]

In assessing Authentix's financials, one of the risks that the investment banks identified was its "customer concentration."[35] This "customer concentration" risk manifested early in the sale process, when a key Authentix customer, Saudi Aramco, announced that it was reconsidering whether to renew its contract with Authentix, which was set to expire in May 2016.[36] Authentix therefore delayed the start of its sale process to the summer of 2016.[37] In the meantime, Saudi Aramco agreed to several short-term extensions of its contract with Authentix.[38] Authentix also faced

---

[31] *Id.* ¶¶ 44, 102–03.
[32] *Id.* ¶ 47.
[33] *Id.* ¶¶ 47–52.
[34] *Id.* ¶¶ 49, 53.
[35] *Id.* ¶ 54.
[36] *Id.* ¶¶ 54–55.
[37] *Id.* ¶ 55.
[38] *Id.* ¶ 55–56, 67.

uncertainty regarding the renewal of contracts with the governments of Ghana and Cameroon.[39]

In mid-October 2016, while the Saudi Aramco contract remained in place under short-term extensions, Baird solicited bids for a sale of Authentix from 127 potential buyers, setting a deadline to respond of December 22, 2016.[40] Of the 127 potential buyers that Baird approached, four responded with what the Amended Complaint characterizes as "bids."[41]

Baird presented those "bids" to the Authentix Board on December 22, 2016,[42] though it described them as "indications of interest," not "bids."[43] Two of the indications of interest featured "holdbacks," the payment of which were contingent on the renewal of contracts with Saudi Aramco, Ghana and Cameroon.[44] For example, Innospec Inc. submitted a $177 million indication of interest, $100 million of which was designated as "holdbacks" for Saudi Aramco, Ghana and Cameroon.[45] OpSec Security similarly provided an indication of interest for $145 million, of which $45 million was contingent on the renewal of the Saudi Aramco contract.[46] The other two indications of interest featured no holdbacks: Intertek Group plc

---

[39] *Id.* ¶ 60.
[40] *Id.* ¶ 59.
[41] *Id.*
[42] *Id.* ¶ 60.
[43] Lintner Aff. Ex. C at 1–2, Ex. D at 1.
[44] Am. Compl. ¶¶ 63–64.
[45] *Id.* ¶ 63.
[46] *Id.* ¶ 64.

provided an indication of interest of $120 million with no contingency holdbacks, and TBG provided an indication of interest with a range of $207 million to $248 million.[47] In its December 22, 2016 presentation, Baird also informed the Board that "[s]everal buyers declined at this point but would be open to participating in a process next year," i.e. 2017.[48]

The four potential bidders then completed due diligence, after which OpSec withdrew its interest, and the remaining three provided revised bids.[49] Baird presented those revised bids to the Authentix Board on March 2, 2017.[50] Innospec confirmed its bid of $177 million, $77 million of which was guaranteed, and $100 million of which was contingent on the renewal of contracts with Saudi Aramco, Ghana and Cameroon.[51] Intertek increased its bid to $140 million, $85 million of which was guaranteed, and $55 million of which was contingent on the renewal of the Saudi Aramco and Ghana contracts.[52] TBG reiterated its interest in the range of $207 million and $248 million, but it stated that it was in the midst of a "very large" transaction that was expected to close in April 2017.[53] TBG therefore requested a

---

[47] *Id.* ¶¶ 65–66.
[48] *Id.* ¶ 61.
[49] *Id.* ¶ 68–69.
[50] *Id.* ¶ 68.
[51] *Id.* ¶ 70.
[52] *Id.* ¶ 71.
[53] *Id.* ¶ 72.

two-month delay to complete the other transaction before "turning to Authentix."[54]
OpSec withdrew its indication of interest, citing the contractual renewal risk.[55]

Of the two bids from Innospec and Intertek that were active, the Board voted to grant exclusivity to Intertek, which offered the higher guaranteed amount at $85 million, but the lower total amount at $140 million.[56] Of the five Board members, only Manti's representative, Barberito, voted against granting Intertek exclusivity.[57] He proposed instead that the Board wait "until the Saudi Aramco and Ghana contracts were renewed."[58] Shortly thereafter, the Board learned that Authentix had won a "technical trial competition" for Saudi Aramco, which allegedly "put[] it in prime position to win contract renewal."[59]

Believing that the Intertek bid was insufficient, Barberito requested permission to solicit third parties to make an independent bid.[60] Barberito received permission, although Steve Bailey, one of Carlyle's Board representatives, imposed a one-week deadline to submit a bid.[61] Steve Bailey later explained to Barberito that he "was under pressure to sell Authentix because it was one of the last investments

---

[54] *Id.*
[55] *Id.* ¶ 69.
[56] *Id.* ¶ 74.
[57] *Id.* ¶ 76.
[58] *Id.*
[59] *Id.* ¶ 77.
[60] *Id.* ¶ 78.
[61] *Id.* ¶ 79.

still open in the applicable fund, and it was time for Carlyle to monetize and close that fund so the money could be returned to investors."[62]

Despite the tight deadline, Manti procured a private equity firm, White Deer, which submitted a timely bid with Manti of $105 million, with no contingency holdbacks.[63] In an email to White Deer, Steve Bailey expressed his appreciation for the bid and asked White Deer to meet with Baird to discuss further, expressing that "[t]ime is very important":

> We very much appreciate this indication. And your speed! We obviously think super highly of Lee. I think the right next step please would be for you all to talk to our advisors from Baird who are copied here (Trish and David) today please if at all possible given the urgency. Baird has some clarifying questions please. We are reconvening tomorrow mid morning with Baird to discuss and decide a plan. Time is very important please know if you can please chat with Baird today as we plan to decide tomorrow morning. Thank you very much.[64]

After two days of negotiation, Manti and White Deer increased their bid to $107 million.[65] Manti and White Deer then visited Authentix on March 22, 2017 to meet with Bernard Bailey and conduct "confirmatory due diligence."[66] According to the Amended Complaint, at that meeting, Bernard Bailey perceived that Manti and White Deer planned to bring back Authentix's former CEO, and therefore spent

---

[62] *Id.* ¶ 57.
[63] *Id.* ¶ 80.
[64] *Id.* ¶ 81.
[65] *Id.* ¶ 82.
[66] *Id.* ¶ 84.

much of the meeting "promoting himself" and "disparaging Authentix's former management."[67] The Amended Complaint alleges that Bernard Bailey also stated repeatedly during the meeting that he "worked for Carlyle" and that "he had been told to sell the company."[68]

Following the meeting, White Deer withdrew from the Sale process, though it recommended a replacement bidder, Blue Water Energy.[69] The Board permitted Blue Water Energy to conduct due diligence but stopped short of granting it exclusivity.[70] According to the Amended Complaint, after conducting due diligence, Blue Water Energy indicated that it "liked the opportunity very much."[71]

Blue Water Energy and Manti met with Bernard Bailey on April 12, 2017.[72] Again, the Amended Complaint alleges that during this meeting, Bernard Bailey "disparaged" Authentix's former management, "took all credit for Authentix's financial success," and "threatened to quit and take all of the top managers with him if Manti purchased the company and brought" back Authentix's former CEO.[73] After the meeting, Blue Water Energy told Manti that it was concerned about doing

---

[67] *Id.* ¶¶ 84–85.
[68] *Id.* ¶ 85.
[69] *Id.* ¶¶ 86–87.
[70] *Id.* ¶ 88.
[71] *Id.* ¶ 89.
[72] *Id.*
[73] *Id.*

11

a deal that involved Authentix's former management.[74] Manti therefore "bowed out" of the bidding process.[75]

Around this time, TBG, which had submitted an indication of interest ranging from $207 million to $248 million, but requested a delay to complete another large transaction, announced a $900 million acquisition.[76] The Amended Complaint does not allege that TBG subsequently sought to reengage with Authentix.

On April 15, 2017, the Authentix Board voted, over Barberito's objection, to proceed with a sale to Intertek, which had submitted a revised "verbal offer" of $115 million without contingencies.[77] The sale to Intertek was scheduled to be completed by September 2017.[78] Meanwhile, Blue Water Energy continued to conduct due diligence on Authentix.[79]

By June 2017, Intertek began to miss milestones that, according to the Amended Complaint, "would have ensured a sale by September 2017."[80] Intertek also lowered its offer to $85 million, with an additional $30 million contingent on Authentix meeting certain post-closing financial metrics.[81]

---

[74] *Id.*
[75] *Id.*
[76] *Id.* ¶ 90.
[77] *Id.* ¶ 91.
[78] *Id.*
[79] *Id.* ¶ 92.
[80] *Id.* ¶ 93.
[81] *Id.*

The Board met on June 12, 2017, during which Barberito proposed putting the sale process on hold.[82] Instead, the Board voted, over Barberito's objection, to proceed with a sale to Blue Water Energy, which had agreed to submit a revised bit without Manti or other common stockholder involvement, in exchange for exclusivity.[83]

Blue Water Energy submitted its revised bid on July 22, 2017.[84] This time, Blue Water Energy offered $77.5 million guaranteed, plus an additional $27.5 million in contingent consideration.[85] The $27.5 million holdback was composed of $10 million to be paid if a receivable from Ghana was paid, and $17.5 million to be paid if Authentix achieved certain financial metrics in 2018.[86]

Barberito urged the Board to withdraw from the sale process rather than sell at that price.[87] The other Authentix directors thereafter stopped providing him with updates on the process.[88]

In mid-August 2017, Saudi Aramco renewed its contract with Authentix.[89] Around the same time, Ghana renewed its contract with Authentix, Cameroon "extended" its contract, and Authentix earned a new contract with the United States

---

[82] *Id.* ¶ 94.
[83] *Id.*
[84] *Id.* ¶ 95.
[85] *Id.*
[86] *Id.*
[87] *Id.*
[88] *Id.* ¶ 96.
[89] *Id.* ¶ 97.

Federal Reserve Bank.[90] Despite this change in circumstances, the Board proceeded with the Blue Water Energy transaction as proposed. On September 11, 2017, Steve Bailey and Bernard Bailey circulated to the Board the fully negotiated transaction documents to sell Authentix to Blue Water Energy for $77.5 million guaranteed, with an additional 27.5 million if a Ghana receivable was paid and certain financial metrics were met in 2018.[91]

Barberito wrote a letter to the Board urging it to put the Sale on hold.[92] Instead, he proposed that the Board postpone any sale for a year "and go back to the market with a revised story that reflected Authentix's current condition."[93] He also warned the Board that under the Blue Water Energy's offer, the "common stockholder's equity is wiped out completely."[94]

The next day, on September 12, 2017, the Board met and voted, over Barberito's objection, to consummate the Sale to Blue Water Energy.[95] Before the vote, Vigano explained to Barberito in an allegedly "apologetic telephone conversation" that he was "under orders from Whitney to vote to approve the sale because of its business relationship with Carlyle."[96]

---

[90] *Id.* ¶ 98.
[91] *Id.* ¶ 101.
[92] *Id.* ¶ 102.
[93] *Id.*
[94] *Id.*
[95] *Id.* ¶ 103.
[96] *Id.* ¶ 102.

14

The Sale was not put to a stockholder vote.[97]  That is because the Authentix stockholders, including the Plaintiffs here, were parties to a stockholders agreement that contained drag-along rights applicable to a sale approved by a majority of Authentix stock (the "Stockholders Agreement").[98]  Specifically, Section 3(e) of the Stockholders Agreement provided as follows:

> In the event that . . . a Company Sale is approved by the Board and . . . the holders of at least fifty percent (50%) of the then-outstanding Shares . . . , each Other Holder shall consent to and raise no objections against such transaction . . . .[99]

This obligation to "consent to and raise no objections against" the Sale required Other Holders to "vote the shares of Common Stock held by such Other Holder in favor of such transaction"; "refrain from the exercise of appraisal rights with respect to such transaction"; and "execute any purchase agreement, merger agreement or other agreement . . . in connection with such transaction setting forth terms and conditions of such transaction and any ancillary agreement with respect thereto."[100]

On September 13, 2017, the stockholders were notified that the Board had voted to close the Sale.[101]  Carlyle, as the majority Authentix stockholder, executed

---

[97] *Manti*, 261 A.3d at 1205.
[98] Lintner Aff. Ex. A § 3(e).
[99] *Id.*
[100] *Id.*
[101] Am. Compl. ¶ 12.

a written consent to the Sale.[102]  The Plaintiffs were thus "bound contractually to consent and not object to the [S]ale."[103]

As discussed above, under Authentix's capital structure, the Authentix preferred stockholders were entitled to be paid the first $70 million of Sale consideration, and the common stockholders were only entitled to receive distributions above the first $70 million.[104]  For a sale priced at exactly $70 million, the preferred stockholders would recover their preferred stock investment and a profit, while the common stockholders would get nothing.[105]  As a result, Carlyle, which held a majority of Authentix preferred stock, received the bulk of the $77.5 million in guaranteed Sale consideration, resulting in a profit on its preferred stock investment.[106]  Likewise, Whitney, the second largest Authentix preferred stockholder, recovered its entire investment in Authentix through distributions from the Sale consideration on its preferred stock.[107]

Bernard Bailey also received a payment from the Sale.  Under his employment agreement with Authentix, he was set to receive a cash bonus equal to a percentage of the Sale consideration, for a sale of Authentix between $50 million and

---

[102] *Manti*, 261 A.3d at 1205.
[103] *Manti Holdings, LLC v. Authentix Acquisition Co.*, 2018 WL 4698255, at *4 (Del. Ch. Oct. 1, 2018).
[104] Am. Compl. ¶¶ 40–41.
[105] *Id.* ¶ 41.
[106] *See id.* ¶¶ 2, 12, 39, 41, 101, 103.  The record does not reflect how much stock Carlyle owned.
[107] *Id.* ¶ 103.

$80 million.[108] The maximum bonus, if Authentix was sold for $80 million or above, was $3 million.[109] The Amended Complaint alleges that no additional bonus would be paid to Bernard Bailey under his employment agreement for achieving a sale above $80 million.[110]

### C. Procedural History

The Plaintiffs initiated this action challenging the Sale on August 7, 2020.[111] After the Defendants moved to dismiss the initial complaint on September 3, 2020,[112] the Plaintiffs filed the Amended Complaint on November 3, 2020.[113] The Defendants moved to dismiss the Amended Complaint on November 17, 2020.[114] In their briefing, the Defendants argued that the allegations of the Amended Complaint fail to state claims under the Rule 12(b)(6) standard,[115] and that the Plaintiffs waived their right to challenge the Sale under the Stockholders Agreement.[116]

---

[108] *Id.* ¶ 45.
[109] *Id.*
[110] *Id.*
[111] Verified Compl., Dkt. No. 1.
[112] Defs.' Mot. Dismiss, Dkt. No. 23.
[113] *See* Am. Compl.
[114] *See* Defs.' Mot. Dismiss Pls.' Verified Am. Compl., Dkt. No. 39.
[115] *See, e.g.*, Defs.' Opening Br. Supp. Mot. Dismiss Am. Compl., Dkt. No. 39 §§ II–VI [hereinafter "Defs.' OB"].
[116] *See, e.g.*, *id.* § I.

On June 4, 2021, after briefing, oral argument, and supplemental briefing,[117] I stayed consideration of the Defendants' motion to dismiss here[118] pending an appeal to the Supreme Court of my decision in a related appraisal action regarding the Sale, *Manti Holdings, LLC v. Authentix Acquisition Co.*[119] The Supreme Court affirmed that opinion on September 13, 2021.[120] On November 5, 2021, the parties submitted supplemental memoranda regarding the Supreme Court decision.[121] I then issued an opinion on February 14, 2022 holding that the Plaintiffs did not waive their right to bring this action via the Stockholders Agreement.[122] I also invited the parties to submit supplemental briefing in light of that memorandum opinion.[123] The parties informed me on February 18, 2022 that they believed no further briefing is necessary,[124] and I consider the remainder of the motion to dismiss fully submitted as of that date.

---

[117] *See* Pls.' Answering Br. Opp. Defs.' Mot. Dismiss, Dkt. No. 40 [hereinafter "Pls.' AB"]; Defs.' Reply Br. Supp. Mot. Dismiss Am. Compl., Dkt. No. 43 [hereinafter "Defs.' RB"]; Tr. Oral Arg. Defs.' Mot. Dismiss and Mot. Stay Disc. and Ct.'s Ruling Mot. Stay Held Via Zoom, Dkt. No. 56; Defs.' Suppl. Br. Supp. Mot. Dismiss Am. Compl., Dkt. No. 57; Pls.' Suppl. Br. Regarding Defs.' Mot. Dismiss, Dkt. No. 58; Defs.' Suppl. Answering Br., Dkt. No. 59; Pls.' Suppl. Answering Br. Defs.' Suppl. Br., Dkt. No. 60.

[118] Dkt. No. 62.

[119] 2018 WL 4698255 (Del. Ch. Oct. 1, 2018).

[120] *Manti*, 261 A.3d 1199 (Del. 2021).

[121] *See* Defs.' Suppl. Mem. Supp. Their Mot. Dismiss Am. Compl. and Regarding Recent Supreme Ct. Decision, *Manti Holdings, LLC v. Authentix Acquisition Co.*, Dkt. No. 70; Pls.' Informal Mem. Further Opp. Defs.' Mot. Dismiss, Dkt. No. 71.

[122] *See Manti*, 2022 WL 444272, at *4.

[123] *Id.*

[124] Dkt. No. 76.

## II. ANALYSIS

### A. The Pleading Standard

The Defendants have moved to dismiss the Amended Complaint pursuant to Rule 12(b)(6). On a motion to dismiss under Rule 12(b)(6), I must accept all well pled factual allegations as true, including "vague allegations" that "give the opposing party notice of the claim," and "draw all reasonable inferences in favor of the non-moving party."[125] I may not dismiss the Amended Complaint "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances."[126] Although this pleading standard is plaintiff-friendly, I need not "accept conclusory allegations unsupported by specific facts" or "draw unreasonable inferences in favor of the non-moving party."[127] Nor must I "accept every strained interpretation of the allegations proposed by the plaintiff[s]."[128]

### B. The Amended Complaint States Breach of Fiduciary Duty Claims Against Carlyle and the Director Defendants (Counts I and II)

The Amended Complaint brings counts for breach of fiduciary duty against Carlyle (Count II) and the Director Defendants (Count I).[129] "When determining whether corporate fiduciaries have breached their duties, Delaware corporate law

---

[125] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Holdings LLC*, 27 A.3d 531, 535 (Del. 2011).
[126] *Id.*
[127] *Brown v. Ct. Square Cap. Mgmt., L.P.*, 2022 WL 841138, at *2 (Del. Ch. Mar. 22, 2022).
[128] *Harcum v. Lovoi*, 2022 WL 29695, at *9 (Del. Ch. Jan. 3, 2022) (quoting *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006)).
[129] Am. Compl. ¶¶ 107–17.

19

distinguishes between the standard of conduct and the standard of review."[130]  The standard of conduct describes what fiduciaries are "expected to do and is defined by the content of the duties of loyalty and care."[131]  In contrast, the standard of review "is the test that a court applies when evaluating whether directors have met the standard of conduct."[132]

Delaware's default standard of review is the business judgment rule.[133]  Under the business judgment rule, "where a director is independent and disinterested, there can be no liability for corporate loss, unless the facts are such that no person could possibly authorize such a transaction if he or she were attempting in good faith to meet their duty."[134]  If, however, the plaintiff rebuts the applicability of the business judgment, the burden shifts to the defendant to prove that the transaction was entirely fair.[135]  The entire fairness standard, which is "the highest standard of review in corporate law," "involves an inquiry into two interrelated concepts:  fair dealing and fair price."[136]  Because the entire fairness inquiry is fact-intensive, a determination

---

[130] *Chen v. Howard-Anderson*, 87 A.3d 648, 666 (Del. Ch. 2014).
[131] *Id.* (quoting *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 35 (Del. Ch. 2013)).
[132] *Id.* (quoting *Trados*, 73 A.3d at 35).
[133] *Quadrant Structured Prod. Co. v. Vertin*, 102 A.3d 155, 183 (Del. Ch. 2014).
[134] *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *9 (Del. Ch. Oct. 24, 2014).
[135] *Quadrant*, 102 A.3d at 183.
[136] *Crimson*, 2014 WL 5449419, at *9 (quoting *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 644 (Del. 2014), *overruled on other grounds Flood v. Synutra Int'l, Inc.*, 195 A.3d 754 (Del. 2018)).

20

that the entire fairness standard applies to a transaction "normally will preclude dismissal of a complaint on a Rule 12(b)(6) motion to dismiss."[137]

### 1. Entire Fairness Applies to the Sale

The Plaintiffs assert that the entire fairness standard of review applies to the Sale for two independent reasons: first, because the Sale was an alleged conflicted controller transaction, and second, because the Sale was not approved by an independent and disinterested Board.[138] As discussed below, I find both reasonably conceivable, and therefore the entire fairness standard applies to the Sale.

As a threshold issue, the Defendants contend that the Amended Complaint fails to plead that all five Carlyle defendants were controllers because it impermissibly groups all five Carlyle defendants together as "Carlyle" without alleging facts specific to each entity.[139] I disagree. Although this Court generally disfavors group pleading, the Amended Complaint's use of "Carlyle" here "was justified [] given the close relationship between these entities," as pled in the Amended Complaint.[140]

Specifically, the Amended Complaint alleges that Carlyle Holdings was the record holder of a majority of Authentix's stock, that Carlyle Growth was the direct

---

[137] *Orman v. Cullman*, 794 A.2d 5, 20 n.36 (Del. Ch. 2002).
[138] Pls.' AB § IV.C.
[139] Defs.' OB § II.
[140] *In re WeWork Litig.*, 2020 WL 7343021, at *11 (Del. Ch. Dec. 14, 2020) ("[c]omplaint's use of the term 'SoftBank' to capture both SBG and Vision Fund was justified here given the close relationship between these entities").

21

parent of Carlyle Holdings, that TCG was the general partner and manager of Carlyle Growth and had a "management agreement" with Authentix, that Carlyle Investment was the "SEC registered investment advisor" for Carlyle Growth and TCG, and that Carlyle Group was the ultimate parent of Carlyle Holdings, Carlyle Growth, TCG, and Carlyle Investment.[141] The Amended Complaint further alleges that two Authentix directors—Gozycki and Steve Bailey—held positions at Carlyle Group, Carlyle Growth and TCG, and that Steve Bailey was an officer of Carlyle U.S. Growth Fund III Authentix Holdings GP, L.L.C., which has "full authority" to act on behalf of and Carlyle Holdings.[142] Based on these allegations, it is reasonably conceivable that all five of the Carlyle defendants exercised control over Authentix. I therefore turn to whether Carlyle was conflicted with respect to the Sale.

Delaware courts have identified two categories of conflicted controller transactions that implicate the entire fairness standard: "(a) transactions where the controller stands on both sides; and (b) transactions where the controller competes with the common stockholders for consideration."[143] The Plaintiffs here do not contend that Carlyle stood on both sides of the Sale. Under the second category, a controller competes with common stockholders for consideration when it (i) "receives greater monetary consideration for its shares than the minority

[141] *See supra* notes 10–20 and accompanying text.
[142] *See supra* notes 21–26 and accompanying text.
[143] *Crimson*, 2014 WL 5449419, at *12.

stockholders," (ii) "takes a different form of consideration than the minority stockholders," or (iii) extracts "'something uniquely valuable to the controller, even if the controller nominally receives the same consideration as all other stockholders.'"[144]

The Plaintiffs do not dispute that Carlyle received the same consideration for its common shares as the other common stockholders. Instead, the Plaintiffs contend that Carlyle received "something uniquely valuable" from the Sale because it had a unique desire to close its investment in Authentix by September 2017.[145]

On these alleged facts, I find it reasonably conceivable that Carlyle received a unique benefit from closing the Sale by September 2017 that rendered it conflicted. The Amended Complaint alleges that Steve Bailey emphasized the "urgency" of the Sale in discussions with White Deer,[146] and that he told Barberito he "was under pressure to sell Authentix because it was one of the last investments still open in the applicable fund, and it was time for Carlyle to monetize and close that fund so the money could be returned to investors."[147] The Amended Complaint further alleges that much of the uncertainties impacting the Sale negotiations—the renewal status of contracts with Saudi Aramco, Cameroon and Ghana—were resolved shortly

---

[144] *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 810 (Del. Ch. 2022) (quoting *IRA Tr. FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at *6 (Del. Ch. Dec. 11, 2017)).
[145] Pls.' AB § IV.C.1.
[146] *See supra* note 64 and accompanying text.
[147] *See supra* note 62 and accompanying text.

23

before the Board approved the Sale, but that neither Carlyle nor the Director Defendants revisited the terms of the Sale or reengaged with other bidders.[148] Significantly, moreover, because Authentix's preferred stockholders were entitled to receive the first $70 million in consideration, Carlyle was poised to receive the bulk of the $77.5 million in guaranteed Sale consideration—a profit on its preferred stock investment—before common stockholders received anything.[149]

The Defendants assert that this Court has consistently rejected the theory that a controller's unique need for liquidity can constitute a disabling conflict.[150] According to the Defendants, Carlyle had every incentive, as Authentix's largest common stockholder, to maximize the consideration that common stockholders received from the Sale.[151]

I agree with the Defendants that Delaware law generally presumes that stockholders "have an incentive to seek the highest price for their shares,"[152] and that as a result, "liquidity-driven theories of conflicts can be difficult to plead."[153] But as this Court has recognized, "the reality is that rational economic actors sometimes do place greater value on being able to access their wealth than on

---

[148] *See supra* notes 89–96 and accompanying text.
[149] *See supra* notes 104–06 and accompanying text.
[150] Defs.' OB § III.A.2.
[151] *Id.* § III.A.1.
[152] *Crimson*, 2014 WL 5449419, at *17.
[153] *In re Mindbody, Inc.*, 2020 WL 5870084, at *18 (Del. Ch. Oct. 2, 2020).

accumulating their wealth."[154]  Steve Bailey's statement that he was under pressure from Carlyle to close the Sale quickly so that Carlyle could close its applicable fund, together with the nonratable benefit Carlyle received from its preferred stock holdings, and the Director Defendants' decision to cut the lone dissenting stockholder, Barberito, out of the deliberations,[155] gives rise to a reasonable inference that Carlyle derived a unique benefit from the timing of the Sale not shared with other common stockholders, rendering it conflicted.

As a fallback, the Defendants make a perfunctory argument that the Sale was cleansed under the framework provided in *Corwin v. KKR Financial Holdings LLC*,[156] because it was approved by Carlyle, Authentix's majority stockholder.[157] But "*Corwin* cleansing" does not apply to conflicted controller transactions.[158]  And *Corwin* cleansing relies on a majority of *disinterested* shares.[159]  Accordingly, the Sale was not cleansed under *Corwin*, and entire fairness applies.

---

[154] *Id.*
[155] *See supra* note 88 and accompanying text.
[156] 125 A.3d 304, 308–14 (Del. 2015).
[157] Defs.' OB at 40.
[158] *See Larkin v. Shah*, 2016 WL 4485447, at *13 (Del. Ch. Aug. 25, 2016) ("[U]nder *Corwin* . . . , the business judgment rule irrebuttably applies if a majority of disinterested, uncoerced stockholders approve a transaction *absent a looming conflicted controller*." (emphasis in original)).
[159] *See Lockton v. Rogers*, 2022 WL 604011, at *10 (Del. Ch. Mar. 1, 2022).

## 2. The Amended Complaint Pleads That the Sale Was Not Entirely Fair

Under the entire fairness standard, "the burden of proof shifts to the defendant, who must either establish the entire fairness of the transaction or show that the burden of disproving its entire fairness must be shifted to the plaintiff."[160] Determining whether a defendant has met that burden "will normally be impossible by examining only the documents the Court is free to consider on a motion to dismiss—the complaint and any documents it incorporates by reference."[161] Because the entire fairness "inquiry is fact intensive, it is rare the court will dismiss a fiduciary duty claim on a Rule 12(b)(6) motion when entire fairness is the governing standard of review."[162] The pleading standard here is low—the Plaintiffs need only plead "some facts" supporting an unfair process or price.[163]

The Amended Complaint clears that low burden. The Amended Complaint alleges that for most of the Sale process, Authentix's value was depressed because it faced certain contract renewal uncertainties, but that after the uncertainties had been largely resolved, the Board approved a Sale at a price that still reflected them.[164] The Amended Complaint also alleges that Authentix's majority stockholder, Carlyle, expressed a desire to close the Sale quickly in order to close "the applicable

---

[160] *Orman*, 794 A.2d at 20 n.36.
[161] *Id.*
[162] *Tornetta v. Musk*, 250 A.3d 793, 812 (Del. Ch. 2019).
[163] *Stein v. Blankfein*, 2019 WL 2323790, at *8 (Del. Ch. May 31, 2019).
[164] *See supra* notes 89–96 and accompanying text.

26

fund."[165]  And, the Sale was never approved by an independent special committee of the Board or by the Authentix minority stockholders.[166]  Under these alleges facts, it is reasonably conceivable that the Sale did not reflect a fair process or a fair price.

### 3. The Amended Complaint States Claims Against the Director Defendants

Entire fairness review of the Sale does not automatically doom the three Director Defendants' motion to dismiss.  Rather, this Court "refuse[s] to presume that an independent director is not entitled to the protection of the business judgment rule solely because the controlling stockholder may itself be subject to liability for breach of the duty of loyalty if the transaction was not entirely fair to the minority stockholders."[167]  As a result, this Court considers each director "individually when the directors face claims for damages in a suit challenging board action."[168]  That individualized consideration must begin with the presumption that independent directors are "motivated to do their duty with fidelity."[169]

The Director Defendants here are protected by an exculpatory charter provision pursuant to 8 *Del. C.* § 102(b)(7),[170] which insulates them from liability for duty of care claims.  "When the independent directors are protected by an

---

[165] *See supra* note 62 and accompanying text.
[166] *See supra* notes 97–103 and accompanying text.
[167] *In re Cornerstone Therapeutics Inc, S'holder Litig.*, 115 A.3d 1173, 1183 (Del. 2015).
[168] *Id.* at 1182.
[169] *Id.* at 1183 (quoting *In re MFW S'holders Litig.*, 67 A.3d 496, 528 (Del. Ch. 2013), *aff'd sub nom. Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014)).
[170] Lintner Aff. Ex. J at 14.

exculpatory charter provision and the plaintiffs are unable to plead a non-exculpated claim against them, those directors are entitled to have the claims against them dismissed."[171] I must therefore dismiss the Amended Complaint against the Director Defendants unless it states breach of loyalty claims against them.

Because the Director Defendants are protected by an exculpatory provision, the Amended Complaint must plead facts "supporting a rational inference that the director harbored self-interest adverse to the stockholders' interests, acted to advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith."[172] As discussed below, I find that the Amended Complaint meets that standard with respect to all three Director Defendants.

#### 4. Defendants Gozycki and Steve Bailey

Defendants Gozycki and Steve Bailey were dual fiduciaries of Carlyle and Authentix, serving as directors of Authentix and as managing directors and officers of certain Carlyle defendants.[173] "If the interests of the beneficiaries to whom the dual fiduciary owes duties are aligned, then there is no conflict. But if the interests of the beneficiaries diverge, the fiduciary faces an inherent conflict of interest."[174]

---

[171] *Cornerstone*, 115 A.3d at 1176.
[172] *Id.* at 1179–80.
[173] *See supra* notes 21–26 and accompanying text.
[174] *Firefighters' Pension Sys. of City of Kansas City, Missouri Tr. v. Presidio, Inc.*, 251 A.3d 212, 284 (Del. Ch. 2021) (quoting *Trados*, 73 A.3d at 46–47).

I held above that Carlyle's interests diverged from the common stockholders with respect to the Sale.[175] As dual fiduciaries, Gozycki and Steve Bailey therefore faced inherent conflicts of interest. "There is no 'safe harbor' for such divided loyalties in Delaware. When directors of a Delaware corporation are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain."[176] Despite Gozycki's and Steve Bailey's dual fiduciary status, the Board formed no special committee to insulate the Sale process from their influence. To the contrary, the Amended Complaint alleges that Gozycki and Steve Bailey participated in the Sale process throughout, and ultimately voted to approve the Sale.[177] And Steve Bailey allegedly stated that he was motivated to sell Authentix because "it was time for Carlyle to monetize and close th[e] fund."[178] In fact, the Defendant Directors allegedly cut Barberito, who opposed the quick sale of Authentix, out of the process.[179] The Amended Complaint therefore supports a reasonable inference that Gozycki and Steve Bailey acted disloyally in connection with the Sale.[180]

---

[175] *See supra* § II.B.1.

[176] *Berteau v. Glazek*, 2021 WL 2711678, at *19 (Del. Ch. June 30, 2021) (quoting *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983)).

[177] *See, e.g.*, *supra* notes 42, 57, 61–62, 64, 77, 82–83, 87–88, 91–96.

[178] *See supra* note 62 and accompanying text.

[179] *See supra* note 88 and accompanying text.

[180] *Frederick Hsu Living Tr. v. ODN Holding Corp.*, 2017 WL 1437308, at *37 (Del. Ch. Apr. 14, 2017) (reasonably inference that directors "acted disloyally" as dual fiduciaries), *as corrected* (Apr. 24, 2017); *Glazek*, 2021 WL 2711678, at *19 (same).

### 5. Defendant Bernard Bailey

It is also reasonably conceivable that Defendant Bernard Bailey lacked independence from Carlyle. Bernard Bailey served as Authentix's CEO and was a member of the Board.[181] "Under the great weight of Delaware precedent, senior corporate officers generally lack independence for purposes of evaluating matters that implicate the interests of a controller."[182] Consistent with that precedent, Bernard Bailey allegedly stated during Sale negotiations that he "worked for Carlyle" and "had been told to sell the company."[183] At this pleading stage, I accept those allegations as true. It is therefore reasonably conceivable that Bernard Bailey acted disloyally with respect to the Sale.[184]

### C. The Unjust Enrichment Claims (Count V)

The Amended Complaint brings unjust enrichment claims against Carlyle for the consideration it received from the Sale from its preferred shares, and against Bernard Bailey for the $3 million bonus he received in connection with the Sale.[185] The traditional Delaware formulation of an unjust enrichment claim requires the Plaintiffs to show "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the

---

[181] *See supra* note 27 and accompanying text.
[182] *Glazek*, 2021 WL 2711678, at *20 (quoting *In re Ezcorp Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *35 (Del. Ch. Jan. 25, 2016)).
[183] *See supra* note 68 and accompanying text.
[184] *See Frederick Hsu*, 2017 WL 1437308, at *37.
[185] Am. Compl. ¶¶ 131–35.

absence of a remedy provided by law."[186]  That rubric has recently been criticized in a scholarly opinion in this Court, *Garfield v. Allen*, as unduly limited.[187]

In particular, the *Garfield* Court noted that the origins of unjust enrichment were themselves legal, and accordingly the fifth "element" is applicable for the limited purpose establishing jurisdiction in the Court of Chancery where no other grounds to invoke equitable jurisdiction exist.[188]  In such a situation, unjust enrichment is a creature of equity.  It permits a court of equity to remedy a wrongful enrichment by one at the expense of another, even when no tort or contract theory exists to provide recovery.  It allows equity to enforce the maxim, that no wrong shall be permitted without a remedy, which is the foundation upon which the edifice of Chancery was constructed.[189]  But where, as here, Chancery jurisdiction is otherwise invoked, I conclude no further requirement exists for the demonstration of lack of a legal remedy, although at the remedy stage legal damages and restitution or disgorgement may be mutually exclusive.

As I have recently been called upon to explain, unjust enrichment may persist as an alternative theory of recovery, even though a contract, tort or equitable tort has

---

[186] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).
[187] 2022 WL 1641802, at *35–45 (Del. Ch. May 24, 2022).
[188] *Id.* at 40–45.
[189] *See* William T. Quillen & Michael Hanrahan, *A Short History of the Delaware Court of Chancery*, 18 DEL. J. CORP. L. 819, 821 (1993).

also been pled against the same defendant in a complaint, and where the "absence of justification" is alleged to be the tort or contract breach.[190]

## 1. Carlyle

With respect to the unjust enrichment claim against Carlyle, the Defendants argue that the Amended Complaint fails to allege "a relation between the enrichment and impoverishment."[191] This element requires the Plaintiffs to allege "some direct relationship . . . between a defendant's enrichment and a plaintiff's impoverishment."[192] In other words, Plaintiffs must plead an unjustified act resulted in both the enrichment and the impoverishment.

The Amended Complaint alleges that Carlyle was "enriched by the sale of Authentix through receiving distributions on its preferred shares."[193] The Amended Complaint's theory is, in my opinion, not elegantly pled. The overarching theory of the Complaint is that the Sale failed to "maximize Authentix's sale value and obtain the highest value reasonably attainable for the stockholders,"[194] as demonstrated by indications from investment bankers and other potential bidders that Authentix was

---

[190] *Id.* at *40–45; *see also Lockton*, 2022 WL 604011, at *16–17; *Sorenson Impact Found. v. Cont'l Stock Transfer & Tr. Co.*, 2022 WL 986322, at *13 (Del. Ch. Apr. 1, 2022); *Knight v. Miller*, 2022 WL 1233370, at *13 (Del. Ch. Apr. 27, 2022); *Harris v. Junger*, 2022 WL 1657551, at *5 (Del. Ch. May 25, 2022).
[191] *Nemec*, 991 A.2d at 1130.
[192] *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 59–60 (Del. Ch. 2012) (quoting *Anguilla RE, LLC v. Lubert-Adler Real Est. Fund IV, L.P.*, 2012 WL 5351229, at *6 (Del. Super. Ct. Oct. 16, 2012)).
[193] Am. Compl. ¶ 132.
[194] *Id.* ¶¶ 109, 115.

worth more than the Sale consideration.[195] But the Plaintiffs fail to explain how a Sale at an unfair price enhanced the consideration that Carlyle received for its preferred stock—that is, per the Defendants, the Complaint does not identify the enrichment side of the unjust enrichment rubric. Under any sale, the Authentix preferred stockholders were entitled to be paid first.[196] And the Amended Complaint concedes that the Sale consideration was high enough for Carlyle to maximize its payout for its preferred stock.[197]

To be explicit, whether Authentix sold for $70 million or $700 million, the result to Carlyle with respect to its preferred holdings is the same. Any unfair sale did not enrich Carlyle—it in fact impoverished Carlyle to the extent it held common stock. The unjust enrichment claim against Carlyle, the Defendants accordingly argue, must be dismissed. But I think the Defendants read the Amended Complaint too narrowly.

The Amended Complaint alleges that, for reasons of its own, Carlyle desired an immediate sale at an unfair price. This it accomplished. Unless Carlyle suffers from some financial Munchausen syndrome or from autoschadenfreude, I infer that the immediate and unfair Sale alleged worked a benefit—an enrichment—on Carlyle. At this pleading stage, with its Plaintiff-friendly inferences, that is enough

---

[195] *See supra* notes 32–34, 42–47 and accompanying text.
[196] *See supra* note 7 and accompanying text.
[197] *See supra* note 106 and accompanying text.

to satisfy a pleading of an unjustified enrichment.  The Complaint, of course, also alleges that the Plaintiff stockholders were impoverished thereby.  I conclude a cause of action of unjust enrichment has been adequately pled.

### 2. Bernard Bailey

The parties dispute whether the unjust enrichment claim against Bernard Bailey is direct or derivative.  Derivative suits enable stockholders to sue on behalf of the corporation to redress harm done to the corporation.[198]  As a result, in derivative suits, "any recovery must go to the corporation."[199]  In contrast, "a stockholder who is directly injured retains the right to bring an individual action for injuries affecting his or her legal rights as a stockholder."[200]

Accordingly, our Supreme Court has articulated a two-part test to determine whether a claim is direct or derivative, the so-called *Tooley* test:

> [T]he determination of whether a stockholder's claim is direct or derivative 'must turn solely on the following questions: (1) who suffered the alleged harm (the corporation or the stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?[201]

---

[198] *Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251, 1262 (Del. 2021).
[199] *Id.* at 1263.
[200] *Id.*
[201] *Id.* (quoting *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004)).

34

If the Plaintiffs' claim for unjust enrichment against Bernard Bailey belongs to Authentix, it is derivative, it was extinguished in the Sale, and the Plaintiffs lack standing to pursue it.[202]

The unjust enrichment claim seeks to recover the $3 million bonus paid to Bernard Bailey in connection with the Sale.[203] When a claim challenges a side transaction related to a merger, "[t]he Court must distinguish between direct challenges to a merger's fairness and derivative challenges to wrongs merely associated with the merger."[204] To be direct, the side transaction must "divert merger consideration from stockholders, rather than from the acquirer; the diversion must be 'improper,' that is, the product of misconduct by the defendants; and the diversion must materially affect the merger's process or price, calling the merger's fairness or validity into question."[205]

Bernard Bailey contends that the unjust enrichment claim against him is derivative because, according to him, the $3 million bonus was paid out of Authentix's "general assets."[206] But the Amended Complaint alleges otherwise: "Bernard Bailey's $3 million bonus was not paid out of Authentix's assets but was instead treated as a transaction expense that directly decreased, dollar for dollar, the

---

[202] *See id.*
[203] Am. Compl. ¶¶ 131–35.
[204] *Blue v. Fireman*, 2022 WL 593899, at *11 (Del. Ch. Feb. 28, 2022).
[205] *Id.*
[206] Defs.' OB at 56–57.

amount of money distributed to Authentix's stockholders."[207]  This allegation, says Bernard Bailey, is "baseless[]" and "invented out of whole cloth solely to avoid dismissal."[208]  Perhaps.  He offers evidence that he contends proves the allegation false:  his bonus plan required that "Bonuses will be paid out of the general assets of the Company or its successor."[209]

At this pleading stage, however, I must accept the Amended Complaint's allegations as true and may not weigh evidence.[210]  Bernard Bailey may be able to demonstrate at a later stage that Authentix complied with the bonus plan's requirement that bonuses "be paid out of the general assets of the Company or its successor," but I must accept the Amended Complaint's allegation to the contrary as true at this stage.  Taking as true the allegation that the $3 million bonus was treated as a transaction expense and paid out of the Sale consideration, it is reasonably conceivable that the bonus improperly diverted Sale consideration that would have gone to the common stockholders.  Moreover, Bernard Bailey does not dispute that the $3 million bonus was material in the context of the $77.5 million guaranteed Sale consideration and $27.5 million contingent Sale consideration, and I find that it was material.  Accordingly, the unjust enrichment claim against Bernard Bailey is direct.

---

[207] Am. Compl. ¶ 103.

[208] Defs.' OB at 56 & n.15.

[209] *Id.* at 56.

[210] *Burkhart v. Genworth Fin., Inc.*, 2022 WL 1468769, at *2 (Del. Ch. May 10, 2022); *WeWork*, 2020 WL 7343021, at *11 (declining to "weigh evidence on a motion to dismiss").

The Defendants do not challenge the merits of the unjust enrichment claim against Bernard Bailey, contending only that I must dismiss it as duplicative of the breach of fiduciary duty claims.[211] But, again, these claims may be pled in the alternative,[212] and "when this court 'does not dismiss a breach of fiduciary duty claim, it likely does not dismiss a duplicative unjust enrichment claim.'"[213] Therefore, although the Defendants may be correct that the unjust enrichment claim will not provide the Plaintiffs with relief independent of their fiduciary duty claims, I decline to dismiss the unjust enrichment claim against Carlyle as duplicative.[214]

### D. The Aiding and Abetting and Conspiracy Claims Are Dismissed (Counts III and IV)

The Amended Complaint brings an aiding and abetting claim against Carlyle, in the alternative to the breach of fiduciary duty claim against it, and a civil conspiracy claim against all the Defendants, for their actions in connection with the Sale.[215] "[I]n cases involving the internal affairs of corporations, aiding and abetting claims represent a context-specific application of civil conspiracy law."[216] As a result, when this Court dismisses aiding and abetting claims, it often dismisses civil

---

[211] Defs.' OB § VI.B; Defs.' RB § V.B n.12.

[212] *See Garfield*, 2022 WL 1641802, at *49–54.

[213] *SDF Funding LLC et al. v. Stanley Fry et al.*, 2022 WL 1511594, at *18 (Del. Ch. May 13, 2022) (quoting *Frank v. Elgamal*, 2014 WL 957550, at *31 (Del. Ch. Mar. 10, 2014)).

[214] *See Lockton*, 2022 WL 604011, at *17 (declining to dismiss unjust enrichment claim despite being "entirely coterminous with claims that these Defendants breached fiduciary duties").

[215] Am. Compl. ¶¶ 118–30.

[216] *Allied Cap. Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1038 (Del. Ch. 2006).

conspiracy claims "for identical reasons."[217] The parties here agree that the aiding and abetting and civil conspiracy claims therefore rise and fall together.[218]

"The elements of a claim for aiding and abetting a breach of a fiduciary duty are: (1) the existence of a fiduciary relationship, (2) the fiduciary breached its duty, (3) a defendant, who is not a fiduciary, knowingly participated in a breach, and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the non-fiduciary."[219] There is no dispute here that Carlyle owed fiduciary duties to the Authentix minority stockholders because it owned more than 50% of Authentix's outstanding stock.[220] Nor do the parties dispute that the Director Defendants owed fiduciary duties. The Amended Complaint therefore fails to establish knowing participation by a defendant "who is not a fiduciary" or any "concerted action of the fiduciary and the non-fiduciary."[221] Accordingly, the aiding and abetting and civil conspiracy claims must be dismissed.

### III. CONCLUSION

For the foregoing reasons, the Defendants' motion to dismiss is GRANTED with respect to Counts III and IV. The Defendants' motion to dismiss is DENIED

---

[217] *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 215 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007) (TABLE).
[218] *See* Defs.' OB § V; Pls.' AB § IV.F; Defs.' RB § IV.
[219] *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 172 (Del. 2002) (quoting *Fitzgerald v. Cantor*, 1999 WL 182573, at *1 (Del. Ch. Mar. 25, 1999)).
[220] *See* Am. Compl. ¶ 2.
[221] *Gotham*, 817 A.2d at 172.

with respect to the remaining counts. The parties should confer and submit a form of order consistent with this memorandum opinion.